[Allen v. The State.

juries, with general powers, at one and the same term.    The
indictment should have been quashed.

Reversed and remanded.



# Allen v. The State.

### Indictment for Grand Larceny.

1.  *Larceny of lost goods.*—Lost goods are the subject of larceny;
and when a lost pocket-book, containing money and papers, is found
by children, and delivered by them to their father, he is to be re-
garded as the actual finder, in determining the question of his crim-
inal liability for the larceny thereof.

2.  *Same.*—To constitute the larceny of lost goods, the intent to
appropriate them must exist at the time of the finding; and this
intent is to be determined from a careful consideration of the facts
and circumstances attending, preceding, and following the finding;
but, if the larcenous intent did not exist at the time of the finding, a
subsequent concealment, or fraudulent appropriation of the goods,
does not constitute larceny.

3.  *Same.*—If the finder knows the owner of the lost goods, the
larcenous intent may be inferred from his failure to restore them,
and subsequent appropriation to his own use; and if there are any
identifying marks on any part of the goods, or other facts giving
reasonable grounds for believing that the owner can be discovered,
the failure to use due diligence to discover him, and subsequent
appropriation by the finder to his own use, may establish the larcen-
ous intent.


FROM the Circuit Court of DeKalb.

Tried before the Hon. JOHN B. TALLY.

The defendant in this case was indicted for the larceny of
$487.00 in money, the bills being particularly described, and
alleged to be the personal property of Anthony B. Green.   On
the trial, as appears from the bill of exceptions, said Green
testified to the loss of his pocket-book, containing money as
described in the indictment, on Sunday evening, February
23d, 1890, under the following circumstances: he had been
spending the day at his mother's house, and was returning to
his own house in the evening on horse-back, and had placed
the pocket-book in the inside pocket of his overcoat, and
threw the overcoat across his saddle in front of him; and he
did not discover his loss until the next day.   He described
the pocket-book as being fastened with a rubber strap, and
containing, besides the money, two notes, one of which was
signed by T. B. Scott; and further testified, that he had met
four of the defendant's children in the road, going back in the

[Allen v. The State.]

direction from which he came. The prosecution then introduced Kit Harper and his wife as witnesses, who lived about one mile from the defendant's house, and each of whom testified, in substance, that the defendant and his wife came to their house on said Sunday evening, about an hour after supper, the defendant saying that he wanted to see them about something; that the four went up stairs together, when the defendant produced a pocket-book, which he said his children had found that evening and given to him, and asked Harper to count the money; that Harper counted the money, which corresponded with the amount and denominations of the bills contained in the lost pocket-book, and also found two notes in it; "that he could not make out any name to correspond with any of the Green family, but did make out the name of T. B. Scott on one of the notes; that they were all examining the pocket-book, to see to whom it belonged, and talked a good deal about what defendant ought to do with it; that Harper told defendant, if he had found that amount of money, he would keep it awhile, and would consider it his if no one called for it; that defendant said, he did not want them to say anything about it; that Harper told him, his children would give him away, but defendant replied, that he was not afraid of any of them but the cross-eyed boy—they could not fool him; and that the defendant's wife, who could read, though her husband could not, called over the names of all the Greens, but none of the names on the papers corresponded with them."

"This being, in substance, all the evidence introduced by the State, the defendant thereupon requested the following charges in writing," duly excepting to the refusal of each. (1.) "If the jury believe from the evidence that the defendant's children found the money alleged to have been stolen, and gave it to the defendant; then the defendant can not be found guilty, and they must acquit him." (2.) "If the jury believe from all the evidence that the defendant took the money to Kit Harper's house, for the purpose of finding out the owner, and afterwards converted it to his own use, no matter with what intent, he can not be convicted, and the jury must find him not guilty." (3.) "The defendant in this case was not bound to find out the owner, even if by diligence he could do so, if there were no marks on the money, or signs or circumstances understood by him, to enable him to discover the owner."

John H. Disque, for appellant.

Wm. L. Martin, Attorney-General, for the State, cited *Griggs v. State*, 58 Ala. 425.

[Allen v. The State.]

CLOPTON, J.—The charge, to the refusal of which the first exception is taken, asserts the naked proposition, that if the money, for the larceny of which defendant is indicted, was found by his children, and delivered to him, he can not be guilty of larceny, whatever may have been his intent at the time of taking the money. Finding it, and its delivery to the defendant by the finder, did not deprive the money, as to the owner, of the character or *status* of lost property; the ownership remained in him, drawing to it, constructively, the right of possession. When defendant took the money from his children, he knew it had been lost, and took it as such. It is manifest the children had no felonious intent, and properly delivered the money to their father for his disposition. By receiving it from his children, knowing it was lost, defendant assumed, in legal contemplation, by voluntary substitution, as to the money and the owner, the relation occupied by the finders, placing himself in their stead. Otherwise, a person knowingly receiving lost property from the finder, who had no intent to steal, with the felonious intent to appropriate it to his own use, escapes punishment. In such case, whether or not the person taking the money is guilty of larceny, must be determined on the same principles which govern in the case of the actual finder.

These principles have been so thoroughly and elaborately discussed in *Griggs v. State*, 58 Ala. 425, which is in accord with the great weight of authority, that it will suffice to state them substantially in the language of the opinion, without elucidating or fortifying them by other argument. The following propositions are clearly established : *First*, lost goods are the subject of larceny, and the place where found is immaterial. The owner is not divested of the right of property by the loss at any place, and has, constructively, the right of possession. *Second*, in order to stamp the conduct of the finder with larcenous character, the intent to convert them absolutely to his own use must co-exist with the act of finding. If such intent does not exist at the time of the finding, a subsequent concealment, or fraudulent appropriation, does not constitute larceny. *Third*, the existence of the criminal intent may be ascertained, like the intent with which any other act is done, by a careful examination of the facts and circumstances preceding, attending, and following the finding. In order to ascertain the original intent, inquiries may be made as to the manner in which the finder conducted himself with the goods, and his present means of knowing or ascertaining the owner. *Fourth*, though the taking is not larceny, when there are no *indicia* indicating the owner, and the finder really be-

lieves he can not be found; yet, if at the time of the taking, he knew the owner, or had reasonable grounds for believing he could be discovered, it is his legal and moral duty to hold and restore the goods to the rightful owner; and if, under such circumstances, he absolutely appropriates them to his own use, excluding the dominion of the owner, it is larceny. Reasonable belief that the owner can be found, may result from previous knowledge, or from the attending facts and circumstances, or from facts he learns at the time of the finding, or from any marks or *indicia* on the goods, furnishing immediate means of ascertaining the owner.

It follows from the foregoing principles, that to authorize the conviction of defendant, the evidence should show the existence of the criminal intent at the time his children handed him the money. As the record does not show to the contrary, we must presume that the court instructed the jury in accordance with these principles.

The second exception relates to the refusal to charge to the effect, that if defendant took the money to the house of Kit Harper, a neighbor, for the purpose of finding out the owner, and afterwards converted it to his own use, no matter with what intent, he can not be convicted. Carrying the money to Harper's house, and all then and there done and said, may be properly considered in ascertaining the intent with which he took the money from the children. If at that time he had the criminal intent, and afterwards converted it to his own use, in pursuance of such original intent, merely taking the money to Harper's house in the meantime, for the ostensible purpose of finding out the owner, does not purge the taking of criminality. The charge was calculated to direct the minds of the jury to other considerations than the original intent, and thereby to mislead them.

The third and last exception goes to the refusal of the court to instruct the jury, that defendant "was not bound to find out the owner, even if by diligence he could do so, if there were no marks, signs, or circumstances, understood by him, on the money, to enable him to discover the owner." The money was in a pocket-book, which contained other papers, and which was accidentally dropped from the pocket of an overcoat, while the owner, Anthony B. Green, Jr., was riding along the road, who, just before reaching home, met defendant's children. In the pocket-book were two promissory notes on T. B. Scott. By the charge, the jury would have understood, that they could not find the existence of the criminal intent at the time of taking, unless there were marks or signs *on the money*, which enabled the defendant to find out the owner. It re-

stricts the immediate means of ascertaining the owner within too narrow limits. Conceding there were no signs or marks on the money, if there was any mark or writing on any of the papers in the pocket-book, which reasonably furnished the immediate means of discovering the owner, this is sufficient. From the fact that, in the interview at Harper's house, defendant's wife, who could read, called over all the names of the Greens, and that one of the notes on T. B. Scott was read and examined, the jury may have inferred that there was something on some of the papers which indicated that the owner was named Green.

We discover no error in the record.

Affirmed.